IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CARMEN SALAZAR,

        Plaintiff,

vs.                           No. CIV 05-985 LFG

JO ANNE B. BARNHART,
Commissioner, Social Security Administration,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiff Carmen Salazar ("Salazar") invokes this Court's jurisdiction under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Salazar was not eligible for disability insurance benefits ("DIB"). Salazar moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing.

Salazar was born on July 16, 1953 and was 50 years old at the time of the administrative hearing. She has a high school education [Tr. at 106] and previously worked as a records manager at a law firm and an insurance agency, fabrication operator at a microchip plant, telemarketer, school bus driver, lab technician, and at a temporary agency. [Tr. 101, 109-115, 146-150, 190].

Salazar filed an application for disability benefits on November 11, 2002, alleging an onset of disability on December 1, 1999. [Tr. 82-84]. Salazar's earlier application for disability benefits was denied at the reconsideration level on July 15, 2002, and she did not file a further request for review of that application. The Administrative Law Judge ("ALJ") expressly declined to reopen her

prior application.  [Tr. 21, 29].  Salazar alleges that she is disabled due to anxiety, spinal degenerative

disk disease, fibromyalgia, rheumatic disease, depression, acid reflux, sleep apnea, thalassemia

syndrome, headaches, a hand condition, and neck pain.  [Tr. 137].

Salazar's application was denied at the initial and reconsideration stages [Tr. 55-59, 62-66],

and she sought timely review from an ALJ.  An administrative hearing before the ALJ was held on

June 1, 2004.  [Tr. 488-522].  In a Decision dated November 5, 2004, ALJ William Nail found that

Salazar was not disabled within the meaning of the Social Security Act and he denied her request for

DIB.  [Tr. 20-30].  Salazar sought review from the Appeals Council, which denied her request on

August 25, 2005 [Tr. 6-8].  This appeal followed.

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1]

The burden rests upon the claimant throughout the first four steps of this process to prove disability,

and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the

Commissioner at step five.  If at any step in the process, the Commissioner determines that the

claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are:  at step one, claimant must prove she is not currently engaged in

substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that

---

[1]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2006); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f)(2006); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. §§ 404.1520(b), 416.920(b)(2006).

it "significantly limits [her] physical or mental ability to do basic work activities . . . .;"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (2006);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6]

If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[7] age, education and past work experience, she is capable of performing other work.[8]   If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9]   In the case at bar, the ALJ made the dispositive determination of non-disability at steps four and five of the sequential evaluation, finding that Salazar can return to her past relevant work as a telemarketer or records clerk, and further that she is capable of performing other work existing in the national economy.   [Tr. 28-29].

---

[4]20 C.F.R. §§ 404.1520(c), 416.920(c)(2005).

[5]20 C.F.R. §§ 404.1520(d), 416.920(d) (2005).  If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. §§ 404.1525(a), 416.925(a) (2005).

[6]20 C.F.R. §§ 404.1520(e),(f) 416.920(e),(f) (2006).

[7]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are:  sedentary, light, medium, heavy and very heavy.  20 C.F.R. §§ 404.1567, 416.967 (2006).

[8]20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Salazar contends that the final administrative decision is not supported by substantial evidence, that the Commissioner did not carry her burden of proof, and that the Commissioner did not apply the correct legal standards.

### Standard of Review and Allegations of Error

On appeal, the Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to consider whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992).

In Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996), the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects. (citations omitted).

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court can neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

In this case, the ALJ found that Salazar has the RFC to perform a limited range of sedentary work as long as she was given the opportunity to alternate sitting and standing, and with no overhead work. He found further that she could return to her past relevant work as a telemarketer and record

clerk, and that she can perform other occupations existing in the national economy, including charge account clerk, and surveillance systems monitor.

Salazar claims the ALJ erred in the following ways:

(1) The ALJ's RFC finding, that Salazar can perform a limited range of sedentary work that includes an opportunity to occasionally alternate between sitting and standing, is unsupported by substantial evidence, in the following ways:  his pain analysis, which questioned the credibility of Salazar's allegations of disabling pain, was erroneous; he incorrectly concluded that Salazar's conditions were alleviated with treatment; he incorrectly relied on the fact that the record does not contain any opinions from treating physicians indicating that Salazar is disabled, while failing to ask her treating physicians for an RFC assessment; he found at step two that Salazar's impairments of osteoarthritis in the hands and obstructive sleep apnea are "severe" impairments but did not include any limitations relating to her hands and sleep apnea in the hypothetical question to the vocational expert ("VE") at the hearing, nor did he incorporate these functional limitations into the RFC finding at step five; and he erred in finding that Salazar's mental impairment is not severe.

(2)  The ALJ's findings regarding Salazar's ability to return to past relevant work is contrary to the law and the evidence.

(3)  The ALJ erred in his conclusion that Salazar has the capacity to perform other work in the national economy.

(4)  The ALJ failed to develop the record by: (a) assisting Salazar in procuring additional treatment records, (b) failing to elicit evidence at the hearing about Salazar's depression and anxiety; and (c) failing to ask Salazar's treating physicians to comment on her RFC.

5

**Discussion**

The Court finds that the ALJ's determination with respect to Salazar's RFC is not fully supported by the record, and a remand will be ordered for redetermination of Salazar's RFC. In light of this conclusion, the Court need not reach Salazar's challenges to the ALJ's rulings on ability to return to past relevant work and ability to perform other work in the national economy, as these rulings must be re-visited by the Commissioner in the light of any revisions made to the RFC determination.

The Court rejects Salazar's arguments that the ALJ erred in finding that Salazar's mental impairment was not severe, and that the ALJ failed to develop the record.

I.
The ALJ's RFC Finding is Not Supported by Substantial Evidence

The ALJ's opinion was carefully considered and well reasoned. However, the Court agrees with Salazar that he overlooked some portions of the record and gave too much emphasis to other portions in reaching his RFC determination.

The ALJ found that Salazar cannot perform the full range of sedentary work but is capable of performing "a limited range of sedentary . . . work that includes an opportunity to occasionally alternate between sit/stand, no continuous sitting, no continuous standing, and no overhead work." [Tr. 24]. Sedentary work is defined as that which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567 (2006).

At the hearing the ALJ proposed a hypothetical to the VE, describing an individual with the

RFC noted above, and with Salazar's age, education and experience.  This hypothetical elicited the responses from the VE that such an individual could perform two of her past relevant jobs, as well as other work existing in the national economy.  [Tr. 516-518].  The ALJ based his "not disabled" conclusion primarily on this testimony by the VE.  [Tr. 28-29].

Salazar argues that, for a number of different reasons, this RFC finding is faulty.  The Court agrees with Salazar that the ALJ, in an otherwise thorough and sound opinion, did not provide sufficient record support for his finding that Salazar's allegations of pain were not credible, that her conditions improved with treatment sufficiently to enable her to work, and that her fibromyalgia is not disabling.  In addition, he erred in failing to include all of Salazar's severe impairments in the hypothetical question posed to the VE.  The RFC finding must therefore be revisited on remand.

A.  Standards for Determining RFC

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuous basis – that is, eight hour a day for five days a week, or an equivalent work schedule.  "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  The RFC is not the least an individual can do despite her limitations or restrictions, but the most.  20 C.F.R. § 404.1545(a) (2006).

The RFC assessment must first identify the individual's functional limitations or restrictions, and assess her work-related ability on a function-by-function basis, including the functions listed in paragraphs (b), (c) and (d) of 20 C.F.R. § 404.1545 (2006).  Soc. Sec. Ruling 96-8p, *supra*, at *1. Those functions include physical and mental abilities, as well as other abilities that might be affected

by the claimant's impairments.  When the claimant has a severe impairment not meeting the listings, the ALJ must consider the limiting effects of all of the claimant's impairments, even those that are not severe, in determining RFC.  20 C.F.R. § 405.1545(e) (2006).

In making the RFC assessment and the ultimate disability determination, the ALJ must consider all symptoms, including pain, and the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  20 C.F.R. § 404.1529(a) (2006).

B.  Standards for Performing the Pain Analysis

In evaluating a claimant's complaints of pain, the ALJ, and the Court on review of the Commissioner's decision, must consider: (1) objective medical evidence of an impairment that causes pain; (2) whether a loose nexus exists between the impairment and the subjective complaints of pain; and (3) whether the pain is disabling based upon all objective and subjective evidence.  Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987).

> [T]he law has never required and does not now require that medical evidence identify an impairment that makes the pain inevitable . . . . For example, an impairment likely to produce *some* back pain may reasonably be expected to produce *severe* back pain in a particular claimant . . . .  By requiring consideration of evidence other than objective medical data, Congress recognized that the severity of pain is inherently subjective . . . .  A proper reading of the statute appropriately recognizes that two patients with the same impairment may be affected to totally differing degrees.  [Emphasis in original].

Luna v. Bowen, *supra*, at 164-165.

Once the "loose nexus" step has been reached, the ALJ must then take into account a variety of factors, including the levels of medication taken by the claimant and their effectiveness, the claimant's persistent attempts to obtain relief and willingness to try any treatment prescribed, the

frequency of medical contacts, the nature of daily activities, subjective measures of credibility, the

consistency or compatibility of non-medical testimony with objective medical evidence, and the

possibility that psychological disorders combine with physical problems.  Luna, *supra*, at 165-66;

Huston v. Bowen, 838 F.2d 1125, 1132 (10th Cir. 1988); Turner v. Heckler, 754 F.2d 326, 331 (10th

Cir.1985).

C.   Problems With the Pain Analysis in This Case

The ALJ in this case did a thorough review of the medical records, then summarized his

findings and concluded as follows:

> The medical records indicate the claimant has a good range of motion
> of her large and small joints.  EMG/Nerve conduction studies were
> normal.  The claimant has undergone epidural steroid injections which
> have provided overall good pain relief.  She has undergone breast
> reduction surgery, and she reported that it helped relieve some of her
> back pain.  A recent medical report indicated that she had no active
> synovitis[10] in the peripheral joints.  She was recently seen for her
> fibromyalgia condition in which she reported pain due to rainy and
> windy weather.  The record does not contain any opinions from
> treating or examining physicians indicating that the claimant is
> disabled or that she has limitations greater than those described in this
> decision.  I find that the claimant's testimony and subjective
> allegations are not consistent with the objective medical evidence and
> are, therefore, not fully supported.

ALJ Opinion [at Tr. 27].

The Court finds that the ALJ's pain analysis and credibility determination are not supported

by the record.

---

[10]Synovitis: "Inflammation of a synovial membrane.  It is usually painful, particularly on motion, and is characterized by a fluctuating swelling, due to effusion [*i.e.*, escape of fluid within a part or tissue] within a synovial sac."  Synovia: "A transparent alkaline viscid fluid . . . contained in joint cavities, bursae, and tendon sheaths, called also synovial fluid."  Dorland's Illustrated Medical Dictionary 423, 1301 (26th ed. 1981) (hereinafter cited as Dorland's).

The ALJ's detailed review of the medical records, along with his finding that Salazar established severe impairments including fibromyalgia, osteoarthritis in the hands, spinal stenosis[11] in the lumbar and cervical spine, and obstructive sleep apnea, indicate that sufficient objective medical evidence exists of pain-producing impairments.  In addition, as discussed in greater detail below, the Court finds (as did the ALJ implicitly) that the record establishes the required "loose nexus" between these impairments and Salazar's allegations of pain.  However, the ALJ erred in his analysis of the factors relevant to determining whether the pain is in fact disabling to this particular individual.

       1.  Salazar's persistent attempts to find pain relief

A review of Salazar's continuing series of visits to various doctors, in her attempt to find relief for the pain caused by her many medical conditions, demonstrates that she indeed made persistent efforts over the course of many years to find relief for her pain symptoms and was willing and eager to try whatever her doctors suggested, up to and including breast reduction surgery, to alleviate back pain.

       a.  *Salazar's Pain Allegations*

In the Disability Report filed on January 13, 2003 in connection with her application for disability benefits, Salazar stated that she has chronic pain, with numbness in her arms and legs if she walks or stands for more than ten minutes.  She said that she tried to go back to work part time, doing temporary work stuffing envelopes, but eventually had to quit this job because she could not use her hands and experienced increased pain in her neck and back when attempting to do this work. [Tr. 137].

On January 20, 2003, after her application for benefits was denied, she expanded on these

---

[11]Stenosis:  narrowing of the canal.  Dorland's at 1249.

complaints in a letter requesting reconsideration.  She stated that her spinal degenerative disease, fibromyalgia, fused bones in her hands, arthritis in her feet, knees and neck, vertigo, anxiety and depression, all combined to prevent her from working.  [Tr. 54].  She stated that the pain in her chest and spine were unbearable, that she has acid reflux and sleep apnea and has to sleep with a CPAP ("continuous positive airway pressure") device, and that the soft tissue throughout her body is extremely painful to the touch.  She also notes that she has thalassemia syndrome (a type of hereditary anemia characterized by a decreased rate of synthesis of hemoglobin).[12]  She says that she wakes up in pain and goes to sleep with pain.  [Id.].

In May of 2003, in connection with her request for hearing, Salazar stated that her fibromyalgia had "flared up" since the breast reduction surgery, that she had severe chronic pain in her chest, ribs and spine, that she experienced numbness in her legs and arms, that at times her neck hurt so much that she could not lift her head, that her hands hurt, and that she suffered sharp pain throughout her entire body.  [Tr. 181].

### b.  History of Medical Visits

As noted above, and as the ALJ found, these many medical conditions are documented in the record.  Four of Salazar's specific complaints were found by the ALJ to be "severe," including spinal stenosis, fibromyalgia, osteoarthritis of the hands, and sleep apnea.  The record also demonstrates that Salazar made repeated, persistent attempts to find relief from the pain caused by these conditions.

Salazar is 4 feet, 11 inches tall and weighs approximately 200 pounds.  [Tr. 257-258].  She is often described as obese in the medical records.

The records indicate that, as early as May 1995, she was seeking medical attention for

---

[12]Dorland's at 1353.

complaints of bilateral knee pain.  She told the doctor she had been doing "quite a bit of walking" and it was causing her left knee to "act up."  He ordered x-rays of her knee, which came back negative for swelling, erythema or significant crepitus (crackling sound in the joint[13]).  The doctor felt the pain was probably due to tendonitis.  The first pain medication he tried had not significantly relieved her pain, so he prescribed a different one.  [Tr. 212-213].

In March 1998, Salazar was taking Zoloft (a selective serotonin reuptake inhibitor, or SSRI, prescribed as an antidepressant),[14] and her doctor noted that the "SSRI therapy . . . seems to be working well."  [Tr. 210].  She was also noted at this time to have fibromyalgia.

On October 6, 1999, Salazar visited her doctor complaining of heartburn, with tightness in her chest and tenderness over the anterior chest wall.  She was diagnosed with gastro-esophageal reflux disease inflammation of the ribs.

On May 1, 2000, Salazar appeared at an urgent care center with complaints of dizziness, headache, shoulder aches and neck ache.  She was noted to be off-balance and light headed.  She was given anti-vertigo and antibacterial medication.  [Tr. 218].  At a follow-up visit on June 8, 2000, she reported that the dizziness improved within about three days on the medication, and the doctor noted that the problem had resolved.  However, he also noted marked tenderness in her abdomen, radiating upward to the sternum, and he referred her to a gastroenterologist as he suspected a peptic ulcer. [Tr. 215-216].

In November/December 2000, Salazar was complaining of cough, breathing problems, and muscle pain throughout her body, 8/10.  She was found to have asthma and pneumonia in the right

---

[13]Dorland's at 317.

[14]Physician's Desk Reference 2443 (53d ed. 1999) (hereinafter cited as PDR).

lung and was given an inhaler [Tr. 329-332, 335].

On January 4, 2001, Salazar was seen by Dr. McGrath in the Lovelace Family Practice Clinic. At this time, she was taking Lodine (a painkiller and anti-inflammatory medication[15]) for her fibromyalgia and/or osteoarthritis, and the doctor noted that this medication might be exacerbating her gastric problems. Salazar also reported chronic anxiety to the doctor and asked that he put her back on Zoloft, which had been discontinued at some point. He complied with this request and also prescribed medications for her gastrointestinal problems. [Tr. 327-328].

On April 5, 2001, Salazar was seen by Dr. Rice at the Lovelace Spine Clinic. He noted her long history of neck pain, mid and lower back pain, and pain in her left leg. He noted further that an MR study done in 1998 showed a small disc protrusion at the L4-5 level, which corresponded to the symptoms she was reporting. The only medication she was taking at this point for pain was Zoloft. Other pain medications caused unpleasant side effects, including stomach problems and a rash. The doctor noted on physical examination that Salazar had some reduced range of motion in the lumbar and cervical spine. Straight leg raise testing resulted in pain in the left lower back and surrounding area. Salazar showed extensive myofascial[16] tenderness throughout the area of the neck, shoulder, and mid to low back. Dr. Rice prescribed Trazodone, an antidepressant, to help with the myofascial pain and associated sleep disturbance, scheduled her for a visit with an exercise physiologist, and gave her an epidural steroid injection for the sciatic pain. [Tr. 430-431].

On June 18, 2001, Salazar saw Dr. Rice again. He noted that Salazar's pain, which he described as diffuse pain in the neck and mid to lower back as well as some sciatic-type symptoms

---

[15]PDR at 3322.

[16]I.e., related to a muscle and its fascia, or fibrous tissue. Dorland's at 486, 860, 861.

in the leg, had been present since at least 1990. He noted also that she had extensive evaluation and treatment for these problems over the years, "without any significant change in her overall pattern of pain" [Tr. 426], and that she had seen an exercise physiologist and was doing some stretching on a semi-regular basis; however, she could not do any aerobic work due to back pain. He made a possible diagnosis of fibromyalgia. Dr. Rice noted also that an epidural injection which Salazar received in April gave her "a very brief period of relief, and then had recurrence to full level of pain subsequently." [Id.].

On physical examination, Dr. Rice found that Salazar was "very guarded" in all of her maneuvers throughout the exam, with extensive myofascial tenderness through the entire neck and back, although her leg and arm neurologic testing were both within normal limits and she displayed no significant joint abnormalities. His assessment was that Salazar suffered from chronic pain which had not responded in any significant way to an epidural block. He noted that the anticonvulsive medication she had tried in the past, Tegretol, gave her a rash; he recommended a trial of Neurontin. He also recommended that she attend Lovelace's classes on Living Well With Chronic Pain, "given the chronic nature of her syndrome." [Tr. 427]. He also recommended warm therapeutic pools to help alleviate the pain of exercise and stated that further injections were not likely to be helpful at that time. [Tr. 430-431].

On June 28, 2001, Salazar was seen in the Family Practice Clinic for follow-up on pain management. Dr. McGrath noted that Salazar had recently been diagnosed with fibromyalgia and was being treated for this condition at the Pain Management Clinic. Salazar told Dr. McGrath she suffered from generalized aches, made worse by exercise. On examination, he found muscle tenderness in her back, although all her joints showed good range of motion with no arthritic changes

evident.  He referred her to the Rheumatology Clinic.  [Tr. 321-322].

On Dr. McGrath's referral, Salazar visited the Rheumatology Clinic on August 9, 2001 for evaluation of possible fibromyalgia syndrome.  She was seen by Dr. Cohen who noted that, in order of severity, Salazar's single worst problem was lower back pain with radiation into her legs, accompanied by numbness and tingling of the toes in her left foot.  This condition was made worse by standing and walking and relieved by lying down with her knees bent.  a An MRI done in 1997 showed a small disc protrusion at L4-5, of uncertain clinical significance, and also narrowing of her spinal canal at all levels caused by congenitally short pedicles (*i.e.,* one of the paired parts of the vertebral arch).[17]  Her second worst problem, he said, was neck pain with radiation into her arms, limitation of motion in her spine, and numbness in her arms.  Her third worst problem was a catching pain in her thoracic spine.  "Lesser, but equally aggravating problems" [Tr. 413] included painful nodules over her trunk, arms and jaws, periorbital pain, migraine headaches, painful bowel movements, and stiffness and swelling in the knees.  Salazar told the doctor that up until eight months ago, she had been walking two miles a day but she has had to discontinue this, because it causes worsening pain in her lower back and numbness in her legs and arms.   [Tr. 413-414].

On physical examination, Dr. Cohen noted that the straight-leg- raise test on the left caused lower back pain and caused the toes of her left foot to go numb.  A positive finding on a straight-leg test is indicative of sciatic involvement.  He noted a full range of motion of all peripheral joints.  In summary, the doctor stated that Salazar has pain, "which is not so much muscular or joint-related, but rather seems referred from her spine at several levels."  [Tr. 415].  He concluded that the congenial spinal stenosis, at multiple levels, is the likely cause of her pain and thus, "I do not think

---

[17]Dorland's at 979, 980.

that fibromyalgia needs to be invoked as a cause of her pain" [Id.].  He recommended a trial of Neurontin.  [Tr. 413-416].

On August 13, 2001, Salazar returned to Family Practice with complaints of numbness in the arms and legs, on both sides.  Physical examination showed diminished range of motion in the neck and tenderness around the cervical spine.  The doctor's assessment included fibromyalgia, chronic neck and back pain, and spinal stenosis.  He placed her on Neurontin, an anticonvulsive drug[18] which he prescribed for pain relief, and noted that she was scheduled for an MRI of the spine and a Neurology consult for nerve conduction velocity studies of the extremities.  [Tr. 319-320].

At some point Salazar was referred for acupuncture treatments for relief of her fibromyalgia symptoms.  It appears that she had several acupuncture treatments between August 14 and September 11, 2001.  [Tr. 308-318].  At various times during these treatments, it was noted that she had areas of pain and tenderness in her body on palpation, decreased hip flexion, anxiety, fatigue, and pain in her neck, head and back.  On August 21, 2001, the therapist noted that Salazar's "body was too sensitive to get a massage."  [Tr. 317].

The acupuncture treatments seem to have helped somewhat, however.  On August 24, she reported that she felt better that day; in fact, better than she had in a long time.  She also reported that day, however, that her headaches and fatigue had gotten worse, and she felt it may be due to the Neurontin prescription.  [Tr. 316].  By August 28, the headaches had decreased but then on August 31, they started up again.  [Tr. 314-315].  Overall, the acupuncture treatments appear to have provided short term relief but did not eliminate Salazar's pain altogether.

On September 12, 2001, Salazar had nerve conduction studies in Neurology.  These were

[18]PDR at 2301.

16

reported as normal, with no evidence of neuropathy, myopathy or radiculopathy.[19]  [Tr. 407-409].

On September 14, 2001, Salazar underwent an MRI of the lumbar spine.  It showed short pedicles at all levels, apparently congenital, as well as a small left paracentral disc protrusion at L4-5 which, combined with facet joint arthritic change and ligamentum flavum[20] thickening, produce a mild narrowing of the spinal canal.  These findings were compared with the 1997 MRI; the radiologist noted that the narrowing had "progressed slightly" since that time.  [Tr. 405-406].  An MRI of Salazar's thoracic spine taken on the same day showed a mild posterior disc bulge at approximately T5-6 level.  [Tr. 404].  An MRI of her cervical spine also taken that day showed small central and right disc protrusion at C5-6 and minimal bulging at C6-7.  [Tr. 402-403].  Disc protrusions and bulging are objective rather than subjective findings.

On September 17, 2001, Salazar was seen by Dr. Guido at the New Mexico Center for Sleep Medicine, on referral from Dr. Cohen, for evaluation of suspected sleep apnea.  Salazar reported that her husband told her she snores quite loudly at night and has stop-breathing episodes during her sleep.  She stated that she finds herself waking at times, feeling that she is gasping and choking.  She also told the doctor she had been having a lot of problems with depression and anxiety over the past 18 months and although her family practice physician suggested an increase in the Zoloft dose, she was somewhat reluctant to do this.

Salazar also told Dr. Guido that she did not feel refreshed or restored upon awakening and often felt sleepy and tired during the day, and that these symptoms had increased since she had been

---

[19]Neuropathy: pathological changes in the peripheral nervous system;  Myopathy: any disease of a muscle; Radiculopathy: disease of the nerve roots.  Dorland's at 862, 888, 1109.

[20]Ligamentum flavum: a series of bands of elastic tissue attached to and extending between vertebrae.  Dorland's at 739.

on Neurontin for pain control.  She also said she suffers from severe reflux symptoms, especially at night.  Dr. Guido felt that Salazar's symptoms, including loud snoring, stop-breathing episodes, sleep disruption secondary to pain and anxiety, were consistent with a diagnosis of obstructive sleep apnea. He advised her to return for a nocturnal polysomnography procedure and asked her to discuss increasing her Zoloft dose with Dr. McGrath.  [Tr. 398-401].

On September 25, 2001, Salazar was seen again by Dr. McGrath for follow-up on her fibromyalgia problem.  She reported some side effects from the Neurontin.  On physical examination, the doctor noted good range of motion in all joints with no arthritic changes found in the hands or feet.  He prescribed a slowly increasing dosage of Neurontin, noting that the current dose was far below a therapeutic level.  He also increased her Zoloft dosage.  [Tr. 307].

On September 27, 2001, Salazar was seen again by rheumatologist Dr. Cohen for follow up of her "multiple musculoskeletal complaints." [Tr. 396].  She told him she had been seeing an acupuncturist, had enrolled in a tai chi class, and was waiting to get into a swimming class.  She was walking 20 minutes a day.  She felt the Neurontin was making her dizzy.  Physical examination revealed full range of motion of all peripheral joints without evidence of synovitis.  The doctor suspected possible median nerve compression in the hand, despite the negative results of neurological test for a carpal tunnel condition, and he recommended that Salazar wear a wrist splint at night.  [Tr. 396-397].

Dr. McGrath saw Salazar again on November 6, 2001.  She told him that recently her hands had been "flaring up" with some swelling.  On physical examination, Salazar's hand showed some tenderness with minimal swelling.  Her wrists were not particularly tender and she had good range of motion and good grip in both hands.  X-rays showed no abnormalities, and earlier nerve

conduction studies were negative.  The doctor's assessment was fibromyalgia, possible arthritis, and chronic hand pain of uncertain etiology.  He prescribed two pain medications and referred Salazar to the Hand Clinic to evaluate the causes of her hand pain.  He also noted that she was to continue with fibromyalgia support groups.  [Tr. 302-305].

Salazar underwent her first nocturnal polysomnogram procedure at the Sleep Clinic on November 11, 2001.  [Tr. 393-395].  The test began around 10:00 p.m. and lasted until around 6:00 a.m. the next morning.  At the time of the test Salazar reported to the technician that she had significant pain, at a level of 10/10.  She felt that this was the primary reason she had trouble going to sleep during the test and stated that this was also her pattern at home.  The test showed that Salazar had moderate obstructive sleep apnea, associated with mild-to-moderate lack of oxygen and "significant disruption of sleep architecture."  [Tr. 394].  She also suffered from prolonged initial insomnia related to her chronic pain syndrome.  Dr. Guido's recommendations were that Salazar be started on a trial of CPAP therapy, that she begin a structured weight-loss program, and that she avoid narcotic pain medications which can worsen snoring and apnea symptoms.  He also noted, "It is quite evident  that the patient's complaint of initial insomnia and some of her sleep maintenance difficulties are clearly related to her chronic pain syndrome."  [Tr. 395].

On November 30, 2001, Salazar was seen by Dr. Balcomb in the Lovelace Hand Clinic for evaluation of her bilateral hand pain.  She told the doctor that the pain was concentrated around the base of her thumbs and index fingers, and that she was awakened at night with tingling symptoms in her hands.  Raising her hands above her head also brought on the symptoms.  The splint recommended by Dr. Cohen was not helpful in alleviating her symptoms.  In recounting her medical history, Salazar told the doctor that she had been getting epidural injections but that she had maxed

out on the number of injections she could have and was no longer getting them.  [Tr. 390].

On physical examination, Dr. Balcomb noted that Salazar had full range of motion in  neck and shoulders, although she was very tender around the muscles of the cervical spine and shoulders. The doctor also noted multiple "trigger points," characteristic of fibromyalgia.  Salazar showed tenderness around the thumbs but good range of motion in the fingers.  The wrist exam showed a good range of motion but with some clicking and pain.  X-rays showed some bone fusion on both sides, although there was no sign of arthritis.  Dr. Balcomb noted that, in spite of the fact that the nerve conduction studies of September 12, 2001 were completely negative, Salazar nevertheless had many signs and symptoms of carpal tunnel problems.  In addition, Salazar had signs of early arthritis at the base of both thumbs,  even though the x-rays were negative for this.  Dr. Balcomb noted that "The patient's symptoms are troubling to her and limiting her lifestyle."  [Tr. 392].  To rule out osteoarthritis, the doctor ordered a whole-body bone scan.  The findings came back on December 6, 2001 and were consistent with degenerative arthritis in the right wrist, as well as the right knee and ankle.  [Tr. 388-389].

On December 27, 2001, Salazar was seen again by Dr. Balcomb who told Salazar she had some "coalitions" (bone fusions) in both hands with some early osteoarthritis, not significant enough to warrant any kind of treatment at that time.  The doctor also said that the numbness and tingling in Salazar's hands were probably related to her neck problems, and she therefore did not recommend doing carpal tunnel injections.  She also recommended weight loss and exercise.  [Tr. 386-387].

On January 13, 2002, Salazar underwent another nocturnal polysomnogram.  At that time, she told the technician that she had pain "all over," at a level of 7-8 out of 10.  After this test, Dr. Guido again assessed Salazar with obstructive sleep apnea, noting that it appeared to be well-

controlled with nasal CPAP therapy.  He noted also that she also had chronic pain, secondary to spinal stenosis and/or fibromyalgia, and that she was taking Zoloft, Neurontin and Trazodone and still complained of significant pain.  Again he recommended that Salazar be put on a structured weight loss program.  [Tr. 271-273].

On January 14, 2002, Salazar was again seen by Dr. McGrath in the Family Practice Clinic. He noted that she had been on Neurontin for six weeks, "without a lot of success."  Salazar told him she felt the Neurontin caused her to gain weight and that although she tried to do water aerobics, she did not exercise regularly because of her pain symptoms.  [Tr. 270, 299].

On January 17, 2002, Salazar was seen again by Dr. Cohen in Rheumatology for follow up on her complaints of neck, back and bilateral hand pain.  The doctor noted that Salazar was attending a water class at St. Joseph's Rehabilitation Center twice a week and was on a waiting list for a more structured water aerobics class as well, was doing tai chi at home, and had started on a diet for weight loss.  He noted also that Dr. Balcomb diagnosed Salazar with early arthritis in the hands.  Salazar had recently started on Diclofenac, a drug with anti-inflammatory and analgesic properties,[21] but she said she was having difficulty tolerating it.  Dr. Cohen recommended a trial of glucosamine.  [Tr. 268-69].

On January 27, 2002, Salazar presented at the emergency room with complaints of chest pain. A physical examination, chest x-ray, and EKG were all negative for a heart attack.  The ER doctor felt this was not an acute coronary event or significant pulmonary event, but rather that the symptoms represented chest wall irritation.  Salazar was discharged in stable condition.  [Tr. 264-267]. Salazar's primary care physician later referred to this episode as an anxiety attack.  [Tr. 259].

On February 11, 2002, Salazar was seen again in the Sleep Clinic.  She reported that she was

---

[21]PDR at 2001, 2933

sleeping longer with the CPAP therapy, after a period of adjustment.  Her husband said that she was

no longer snoring or gasping for breath at night.  She complained, however, that the mask didn't fit

well and hurt her upper lip.  She was sent for a new mask fitting and advised to raise the head of her

bed about 4-6 inches.  [Tr. 261-263].

On March 9, 2002, Salazar was seen again by Dr. McGrath in Family Practice.  They

discussed her ER visit for chest pain and anxiety attack and the fact that the cardiac workup was

negative.  Dr. McGrath noted that Salazar had been on Neurontin for 8-10 weeks and "has not felt

much of difference."  [Tr. 259].  She expressed interest in getting on a higher dose, and he thought

that would be appropriate.  She also told him she had been experiencing dizziness off and on for the

past few weeks.  He prescribed anti-vertigo medication for the dizziness, increased her dosage of

Neurontin, and set up an exercise stress test on a treadmill, due to the recent chest pain.  [Tr. 259-

260].  The treadmill test was done on April 15, 2002 and showed a decreased aerobic capacity but

no EKG changes.  [Tr. 373].

On May 13, 2002, Salazar was seen again in the Sleep Clinic.  The nurse practitioner noted

that Salazar was "doing fairly poorly on home CPAP therapy with fairly poor resolution of

symptoms," probably due to mask fit problems.  [Tr. 258].  However, Salazar had made some

improvements with the CPAP therapy, and she "feels committed to using it."  [Tr. 257-258].

On May 15, 2002, Salazar was seen again by Dr. Cohen.  At this time, she continued to

complain of pain in her legs.  She told the doctor that "walking is like torture.  My left leg goes numb

and burns like I am on fire."  [Tr. 255].  The doctor noted that she'd had epidural blocks in the past,

which helped, but at her last appointment at the pain management clinic "it was felt that an epidural

would be a waste of time because of her having fibromyalgia."  [Id.].  He apparently did not agree

with this assessment, as he made a new referral for Salazar to return to the pain clinic for an epidural. The doctor also noted Salazar's "other musculoskeletal complaints," including numbness of the arms and legs at night, cracking and limitation of motion in her neck, and pain in her hands secondary to osteoarthritis. He also noted that Salazar was continuing to diet and had succeeding in losing another five pounds since her last visit. Other than lab tests and the epidural referral, no other changes were made to her regimen. [Tr. 255-256].

Salazar returned to see Dr. Nairn at the Spine Clinic on May 17, 2002 for the epidural injection as referred by Dr. Cohen. He noted her history of "basically total body pain secondary to fibromyalgia." [Tr. 251]. Salazar reported having increased pain in her back and lower legs. The epidural steroid injection was given, with instructions for follow up as needed. [Id.].

On August 5, 2002, Dr. McGrath again noted that Salazar had been on Neurontin for the last couple of months "without much relief of symptoms"; however, he added that he hoped "she will finally get some relief of her chronic pain symptoms with the more therapeutic dose of Neurontin." His assessment included a diagnosis of chronic back pain, sciatica (a syndrome characterized by pain radiating from the back into the buttock and leg),[22] muscle spasm and fibromyalgia. He also refereed Salazar back to the Spine Clinic for an epidural block. [Tr. 295-296].

On September 12, 2002, Salazar returned to the Spine Clinic complaining of chronic lower back pain, and leg pain. She saw Dr. Hansen, a physician who doesn't appear anywhere else in Salazar's medical records. The doctor noted that "The patient apparently suffers from multiple arthritis and fibromyalgia type problems and has had multiple treatment modalities in the past without any significant help" [Tr. 364], aside from the epidural injections. The doctor gave Salazar the

---

[22]Dorland's at 1178.

injection but spent some time with her, discussing steroids and potential side effects and noting that it would be advisable to space the injections out over a period of 3-4 months.  [Tr. 364].

On September 18, 2002, Salazar returned to see Dr. Cohen in Rheumatology.  She told him that, after the epidural injection of September 12, the numbness in her legs seems to be better.  However, she had recently begun to develop leg cramps at night, "all night long."  She also complained of neck and jaw pain.  On physical examination, the doctor noted that Salazar was a very overweight woman, with large and pendulous breasts.  She showed tenderness of the muscles on either side of the neck.  He noted that she seemed to be suffering not so much from fibromyalgia syndrome as from neck and upper back pain brought on by overly heavy breasts.  He recommended a consultation in cosmetic surgery for possible breast reduction surgery.  [Tr. 362-363].

On September 23, 2002, Salazar was seen by Dr. Morehouse in the Cosmetic Surgery Clinic for evaluation for possible breast reduction surgery.  On that date, she was noted to be 4 feet 11 inches tall, weighing 194 pounds.  She wore a size 42 DDD brassiere.  The doctor noted that she had a longstanding history of back, upper neck and shoulder pain with evidence of spinal stenosis and arthritis in the neck, and felt she could not straighten up.  He noted that "She has undergone different regimens for her back pain which is both upper and lower but basically lives in chronic pain."  On physical examination, he noted that Salazar is a heavy woman with quite large breasts; the approximate weight to remove to get her down to a C cup would be approximately 700 grams.  After discussing the possible risks and benefits of the procedure, doctor and patient determined that breast reduction surgery was warranted.  [Tr. 361].

The breast reduction surgery was performed on October 22, 2002.  Total weight removed was approximately 520 grams from each side.  [Tr. 356-357].  The next day, Salazar was reported to be

24

doing well, with pain rated at 6-7.  [Tr. 355].  On October 31, 2002, Dr. Morehouse reported that Salazar was doing extremely well, with a pain level of 4-5, improving daily.  [Tr. 354].

Later follow up visits to Dr. Morehouse were done on December 3, 2002 and February 3, 2003.  In December, he noted that her incisions were "calming down quite nicely" and that the pain in her back had "markedly improved."  [Tr. 350].  However, at the February visit, he stated that although she was "basically doing well," she was having some continuing back pain as well as some lateral pain in the right breast in the area of the liposuction surgery.  He gave her a small steroid injection in that area.  [Tr. 348].  There are no further references in the record regarding follow up visits to Dr. Morehouse after the breast reduction surgery, although Salazar told a different doctor in February 2003 that she was basically happy with the result, in spite of what she reported as an infection in her right breast three months after the surgery.  [Tr. 464].

Meanwhile, Salazar continued to be followed in the Sleep Clinic.  She was seen on November 11, 2002, and it was noted that at the last visit in May she seemed to be doing poorly on the CPAP therapy.  [Tr. 351-352].

On November 13, 2002, Salazar was seen again in the spine clinic.  She told Dr. Nairn that she felt that the leg pain was now in both legs, rather than being confined as before to the left leg. He assessed her with chronic lower back pain consistent with sciatic nerve irritation, but with good response to epidurals.  He gave her another injection.  [Tr. 353].

On November 26, 2002, Salazar saw Dr. McGrath again and told him that she felt the Neurontin had not been particularly helpful in alleviating her chronic back pain, muscle and joint pain. He decided she should taper off the Neurontin and eventually discontinue it.  He noted, "Hopefully her pain will not worsen particular[ly] musculoskeletal type complaints."  He strongly encouraged

Salazar to continue to follow up with Dr. Cohen in Rheumatology for further treatment of her fibromyalgia. [Tr. 293-294].

On February 3, 2003, Salazar was seen by Dr. Nairn in the Spine Clinic for follow up on her left leg sciatica. She stated she had good response to epidural injections in the past and asked to have another one. Dr. Nairn assessed Salazar with persistent left-sided sciatica symptoms, presumably secondary to lumbar spine disease and fibromyalgia. He gave her the lumbar epidural injection and noted that she could return in a couple of months for a possible repeat injection. [Tr. 467].[23]

On February 21, 2003, Salazar returned to see Dr. Cohen in the Rheumatology Clinic for follow up on her neck and back pain and sciatica symptoms. She told him that she continued to experience pain in the muscles of her neck and upper back, and she complained of an inability to stand for any length of time without developing numbness in her left leg and pain in coccyx region. On physical examination, the doctor found no synovitis in the peripheral joints. He noted that she could resume pool therapy once released to do so by Dr. Morehouse (the breast-reduction surgeon), and she should continue on her current regimen. [Tr. 464-465].

On May 12, 2003, Salazar returned to the Sleep Clinic. She had at this point been on CPAP therapy for about 1½ years and was described as doing "fair" on the therapy. Salazar said she took a nap every day for 1-1½ hours. She stated she was having no further problems with mask fit but complained of mouth and throat dryness. Salazar also stated that she had been having problems with asthma, reporting asthma "attacks" in October, January, March, and again more recently. The nurse practitioner noted in her assessment that the CPAP therapy had resulted in only a "fair" resolution

---

[23]Three weeks later, on a visit to a different doctor, Salazar stated that this injection by Dr. Nairn "must have hit a nerve," as she felt like she had been "electrocuted" [Tr. 464], although Dr. Nairn's report of the injection does not record such an incident.

of Salazar's symptoms, probably secondary to some sedating medications that she was taking.  She encouraged Salazar to ask her physician whether a preventive-type inhaler might not be necessary, in addition to the "rescue inhaler" she was currently using.  She was to return to the Sleep Clinic in one year's time.  [Tr. 460-461].

In April and May 2004, Salazar was seen at the Presbyterian Medical Group for complaints including pain in the neck, shoulder, chest and lumbar area, radiating into the right leg.  She tried Celebrex for the pain, but it hadn't helped.  She also reported numbness in both hands and both feet. She was assessed with fibromyalgia and scheduled for the pain clinic in July.  [Tr. 476-478].

On July 23, 2004, Salazar sent a letter to ALJ Nail, noting that she was scheduled for two procedures at the New Mexico Pain and Spine Center on August 23 and 25, 2004.  [Tr. 482-484]. No further medical records were submitted.

### c.  *Conclusion:  The Record Shows Persistent Attempts to Relieve Pain*

A thorough review of Salazar's medical records leads to the inescapable conclusion that she has suffered for many years from symptoms of pain related to her spinal stenosis, fibromyalgia, osteoarthritis, as well as to her bodily configuration.  In addition, she suffers from sleep apnea, anxiety and depression.  She has made persistent, repeated attempts to find relief for her pain symptoms, visiting physicians and following their directions.

She has tried numerous medications for pain relief and suffered through various side effects of these medications, including stomach ailments, rash, fatigue, and weight gain.  Her physicians recommended that she lose weight as a means of alleviating some of her pain symptoms and sleep apnea, and she has dieted and signed up for water exercise classes and tai chi and performs a regimen of stretching at home.  The record indicates that her lack of success at weight loss is due, at least in

part, to the fact that she experiences increased pain when she exercises, as well as numbness in her legs and arms.  She agreed to undergo breast reduction surgery when recommended by her doctors in an attempt to relieve the strain on her back, neck and shoulders caused by large, heavy breasts.

Salazar has never refused any treatment offered or recommended by her doctors.  At one point, she expressed some reluctance to increase her dosage of Zoloft, but when the increase was recommended and prescribed, she accepted the doctor's advice.  She was amenable, indeed eager, to try the anticonvulsant Neurontin, as recommended by her doctors for pain relief, and to attempt to increase the dose as she became accustomed to the side effects.  She stopped taking this medication, with the concurrence of her physician, only when it became clear that she could not tolerate the side effects.  She underwent several steroid injections and, as noted above, even surgery to reduce the size of her breasts, all in the interests of alleviating her pain.  None of these treatments are without associated dangers and side effects, yet Salazar has cooperated with all of them.

During the period covered by these medical records, Salazar made approximately 50 visits to doctors and other health care providers.  At almost every one of these visits, she reported that she was experiencing pain in various parts of her body, and she asked the doctors to help her find relief. There is no indication that she ever refused or neglected to follow her doctors' advice, but rather made extensive efforts to confront her pain symptoms and try to alleviate them.

The Commissioner argues in her brief that the medical records show that "for more than a year Plaintiff did not seek medical treatment for her alleged symptoms."  Defendant's Response [Doc. 15], at 14.  The Commissioner is apparently referring to the period between May 2003 and April 2004, for which no medical reports appear in the administrative record.

However, the ALJ did not rely on any lack of treatment or lack of medical records in making

his credibility finding.  The Court assumes the ALJ took into account Salazar's statement at the administrative hearing that she wasn't always able to get medical treatment because her husband lost his job sometime in 2002 and, as a result, for a time she wasn't able to pay for medical treatment or for medications.  She said that she and her husband eventually had to file for bankruptcy and that "we're kind of just starting over and that's why I've got  new medical records now."  [Tr. 520].

Lack of medical treatment because of inability to pay does not demonstrate that a patient is neglectful of her health nor does it, in and of itself, indicate a lack of pain symptoms during the period of non-treatment.  As the Tenth Circuit said in the context of medication, "some people find the side effects of pain medication to offset its benefits, others find little relief in pain medication, while others cannot afford certain prescription medications.  Yet their pain can be disabling, nonetheless."  Huston v. Bowen, *supra*, at 1132 n.7.

When Salazar's medical records resume in April/May 2004, they show that Salazar was still experiencing pain in her neck, shoulder, chest and lumbar spine, radiating into her right leg, and that although she was taking Celebrex for the pain it was not helping.  [Tr. 476-477].  This indicates that she had not abandoned her attempts to seek relief from her pain symptoms, and that the pain symptoms had not abandoned her.

In sum, the record demonstrates Salazar's continuing and persistent attempts to find relief for her medically-documented symptoms of pain.  This factor weighs in favor of Salazar in the pain analysis; however, it was not mentioned by the ALJ in his Decision.

2.  Possibility That Psychological Disorders Combine With Physical Problems

In assessing a claimant's credibility with respect to allegations of pain, the ALJ must also consider "the possibility that psychological disorders combine with physical problems."  Luna v.

29

Bowen, *supra*, at 166.  As discussed below, the Court does not agree with Salazar that the ALJ erred in finding non-severe her psychological impairments, including depression and anxiety; nevertheless, even non-severe psychological disorders are relevant to the RFC analysis.

> We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe," . . . when we assess your residual functional capacity.

20 C.F.R. § 404.1545(a)(2),(e) (2006).

Although Salazar's depression and anxiety may not be legally "severe, there is ample documentation in the medical records outlined above that Salazar suffers from these conditions. Several physicians, who treated Salazar for her many other medical complaints, diagnosed these conditions and prescribed antidepressant medication, including Zoloft and Trazodone, which she has taken for most if not all of the time covered by the medical records.

In explaining the basis for his credibility determination, the ALJ did not discuss the possibility that Salazar's depression and anxiety, and the medication she takes for these conditions, may be combining with her other medical impairments to render her disabled.  While the ALJ is not required to touch on every factor raised in the case law as possibly relevant to the credibility determination, in this case, the evidence is strong and consistent that Salazar suffers from depression and anxiety, and has for many years.  She was even seen in the emergency room on one occasion with a suspected heart attack, which was later described by one of her doctors as an anxiety attack.

The Court finds that the ALJ's failure to consider the effects of Salazar's psychological impairments undermines the credibility analysis and is one of the factors that convinces the Court that the case should be sent back for redetermination.

3. <u>Nature of Salazar's Daily Activities</u>

Salazar contends that the ALJ erred in the credibility determination.  Specifically, she argues that the ALJ's description of her daily activities is inconsistent with the degree of pain she alleges.

The ALJ commented that Salazar went on a Carribean cruise, spent time at casinos, went to sporting events and baseball games, went to restaurants, participated in aquatic exercise classes, did yard work, housework and shopping.

Salazar concedes she did these things but challenges the ALJ's description, contending that it is the product of selectively taking only portions of her evidence of daily activities and disregarding others.  She contends that the ALJ ignored the evidence concerning things she can no longer perform.

Credibility decisions are directed to the sound discretion of the fact finder.  <u>Diaz v. Secretary of Health and Human Services</u>, 898 F.2d 774, 777 (10th Cir. 1990).  After all, it is the fact finder who is present at the hearing and who sees and hears the claimant and witnesses, and can observe their demeanor and manner while testifying.  A reviewing court, on the other hand, works with a cold transcript which is free of emotion and feeling.  While transcripts and documentary evidence are important, they are a poor substitute for the in-person evaluation often necessary to put evidence into context and to credit or discredit a witness.

In this case, the Court is remanding for additional consideration.  On remand, the ALJ will once again have the opportunity to consider the evidence.  To facilitate the reconsideration, the Court highlights some of Salazar's evidentiary contentions.

In her Daily Activities questionnaire [Tr. 154-164], filled out in March 2003, Salazar stated that it takes her about an hour each morning to work out the stiffness in her body, and she has to move around until she can straighten out her back.  She does "very limited" household chores, and

31

her husband does most of the cooking for the evening meal.  She does not leave home very often, perhaps once a month for appointments or to stock up on household needs and when she does go out, she is always accompanied by a family member.  She often relies on her 69-year-old mother to take her to the store and to put items in the shopping cart and load the items in and out of the car.  She has trouble getting in and out of vehicles and cannot buckle her own seatbelt due to pain in her hands.

Salazar said that she can no longer vacuum, mop floors or do ironing, although she does do "some laundry" and "a few dishes."   Others in the home help with household chores.  These restrictions are caused by fatigue, her inability to use her hands well, and the fact that her arms and legs go numb when she stands for more than a few minutes or walks for any great length.

She used to have hobbies such as crafts and sewing, but she no longer does these as she cannot sit or stand for very long, her neck and back are too painful, and she cannot use her hands well anymore.  She stated that she used to have "very nice" handwriting.  She cannot use the computer because of her hand limitations.  Her only social contacts are with her family.  She does not go out very often, and her relatives generally come to see her, often to help her run errands.

In her Reconsideration Disability Report [Tr. 175-180], filled out in May 2003, Salazar stated that she has some trouble getting dressed and sometimes needs help tying her shoes, zipping zippers, and buttoning clothes, and her husband has to help her get out of the bathtub.  Her husband also does the shopping, housecleaning, and caring for their grandson.

Salazar's sister submitted a Third Party Daily Activities questionnaire [Tr. 172-174], in which she confirmed many of Salazar's statements.  She said that Salazar does only "limited housework," and no physical activities.  All housework is a problem.  Salazar's husband prepares the food and if and when Salazar does cook, it is very simple.  She cannot stand for very long, and she has limited

use of her hands.  Sometimes she is forgetful because of the medications she uses.  Her sister says that Salazar has become withdrawn and depressed because of her inability to move about freely.  Her friendships have "faded" in the past few years, because she cannot actively visit or interact, and her social contacts are now limited to her family.

On remand, the testimony of relatives and others in a position to observe the claimant is relevant and is to be taken into account by the ALJ in performing the pain analysis.  Huston v. Bowen, *supra*, at 1130.

At the administrative hearing in June 2004, Salazar testified that she rarely drives any more because of the effect of the medications she is taking.  When she knows she has to drive, she does not take her prescriptions.  [Tr. 503].  With regard to other activities, Salazar told the ALJ that the last time she took a trip was in 2001, when her husband and his siblings arranged a Caribbean cruise to celebrate their parents' anniversary.  [Tr. 503-504].  She has not taken any trips since that time.

In response to questions by the ALJ, Salazar further testified that she does not attend church or any kind of meetings.  She does not go to the movies, horse races, car races, dances, plays or musical concerts, and "hardly ever" goes out to eat or to visit a casino.  She does not go fishing or hunting.  The only sporting events she attends are her son's and grandson's baseball games, which she skips if the weather is cold or windy.  [Tr. 504-505].  Salazar further testified that she used to like to refinish old furniture, but she can no longer do the painting and sanding required by this hobby. [Tr. 505-506].

Her testimony is that takes her about an hour each morning after arising to work out the stiffness in her body, and that she does only minor cooking and does no housework; in fact, she said she has hired someone to clean the house.  [Tr. 506-507].  In addition, she stated that she cannot take

33

a shower because she gets dizzy and testified, consistently with her questionnaire statement, that her husband sometimes has to help her get in and out of the bathtub.  [Tr. 509].  She wears slip-on shoes so that she will not have to tie them, and her son's girlfriend sometimes helps her fix her hair for special occasionsJuly 12, 2006 as she cannot blow-dry and curl it on her own.  [Tr. 509].

Salazar also testified that she tries to exercise, as the doctors suggested.  She does some low-impact stretching and has done aquatic exercises as part of the physical therapy regimen ordered by her doctors.  She can no longer walk very far, as her legs and arms go numb.  [Tr. 507-508].

She further testified that she cannot pick up anything with her right hand because of the pain in her shoulder and neck.  She can pick up a gallon of milk, but only if she uses both hands.  She cannot kneel down and can bend over only a bit, although she can squat down to pick something up off the floor if she uses techniques she learned in physical therapy.  [Tr. 511-512].

The ALJ cited Salazar's work on her yard as indicative of activities that belie her allegations of pain.  However, there is contradictory evidence that she used to love gardening but now has to rely on her husband and son to do all the planting; she merely supervises or tells them what to do.  [Tr. 156, 506].  When asked by the ALJ whether she waters or pulls weeds in the yard, she replied, "Once in a while, I water.  Not very often."  [Tr. 506].

As the ALJ will consider evidence relating to the claim, the ALJ should also consider all  of the evidence and testimony in making credibility determinations.

### 4.   Salazar's Pain Has Not Improved to the Degree Found by the ALJ

The Court finds that the ALJ's conclusion that Salazar's condition improved with treatment is not supported by the record.  It is true that portions of the record, as described above, indicate that Salazar made minor or temporary improvements at times in the course of treatment for back, leg, and

neck pain, and for other conditions including depression, asthma and sleep apnea. However, considering the record as a whole, Salazar has experienced only temporary relief for her pain symptoms.

The ALJ noted that the epidural steroid injections "have provided overall good pain relief," and that the breast reduction surgery "helped relieve some of her back pain." [Tr. 27]. While it is true that Salazar obtained pain relief from the steroid injections, there is substantial evidence demonstrating that the pain always came back and she was required to return again and again for more injections. Furthermore, such injections are not without side effects and, as noted above, Salazar was warned of the dangers by one of her physicians and advised that she should not have them at close intervals.

The record does indicate that Salazar obtained pain relief from the breast reduction surgery; however, there is no indication that all pain in her neck and back has been eliminated, or even substantially reduced, as a result of the surgery. Repeatedly throughout the medical record, Salazar's physicians point to her spinal stenosis, or narrowing of the spinal canal, caused in part by congenitally small vertebrae, as one of the primary sources of the pain symptoms. The breast surgery, while helped reduce the pain caused by the stenosis, obviously did not repair the narrowing of the spinal canal.

Nor was Salazar's fibromyalgia relieved by the breast surgery. Indeed, Salazar told one of her doctors that she felt the surgery caused her fibromyalgia condition to "flare up." As she points out in her brief, fibromyalgia is a difficult disease to diagnose and treat, and it creates problems in determining disability as the symptoms are primarily subjective. Brown v. Barnhart, No. 05-5143, 2006 WL 1431446 (10th Cir. May 25, 2006); Moore v. Barnhart, 114 Fed. Appx. 983, 990-992 (10th

Cir. 2004).  The record is replete, however, with references by several different physicians to the fact that Salazar suffers from the condition of fibromyalgia.  Although one doctor felt that her pain was caused primarily by the spinal stenosis and that fibromyalgia need not be "invoked" as a cause, there is no hint from any health care provider that Salazar malingering or exaggerating her symptoms.  The fact that "[n]one of the physicians who examined her rejected her complaints of pain as unfounded" is a relevant consideration.  Nieto v. Heckler, 750 F.2d 59, 62 (10th Cir. 1984).

As of the most recent visit on record, May 2004, Salazar was still seeking relief for her symptoms of pain in the neck, spine, shoulders, chest and legs.  The record does not support a finding that she has obtained pain relief to a degree that would enable her to resume work.

### 5.  Lack of Doctor's Opinion That Patient's Pain is Disabling is Not Conclusive

The Court agrees with Salazar that a finding of disability is not dependent on an express opinion by a treating physician to the effect that a claimant's pain is disabling.  As Salazar correctly points out, the Commissioner may override an opinion from a treating physicians as to the fact of disability, justifiably adhering to the position that the ultimate determination of disability as defined under Social Security law  is for the Commissioner to decide.  20 C.F.R. § 404.1527(e)(1) (2006). "A treating physician may opine that a claimant is totally disabled, but that opinion is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the Commissioner [internal punctuation omitted]."  Mondragon v. Apfel, 3 Fed. Appx. 912, 915 (10th Cir. 2001), *citing* Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir.1994).

In sum, the Court finds that the ALJ's pain analysis in general is not supported by the record and must be revisited on remand.

D.  <u>The ALJ's Hypothetical to the VE Did Not Include All Necessary Elements of the RFC</u>

Salazar also argues that the ALJ erred in finding, at Step Two, that Salazar's hand impairment and sleep apnea are "severe" impairments but then failing, at Step Five, to incorporate these conditions into his RFC finding and failing as well to include them in the hypothetical proposed to the VE.  The Court agrees.

In order to find that an impairment is "severe," the ALJ must find that the impairment significantly limits the ability to do basic work activities, that is, the abilities and aptitudes necessary to do most jobs.  20 C.F.R. §§ 404.1520(c), 1521(b); <u>Williams v. Bowen</u>, *supra*, at 750.

There is ample evidence in the medical records, as detailed above, to support the ALJ's findings that Salazar's hand impairment and sleep apnea fall within the definition of "severe."  This issue has not been challenged by any party.  It follows, as Salazar points out, that these impairments should have been taken into consideration in determining her RFC.  And failure to include them in the hypothetical to the VE constituted error and may have led to an incorrect conclusion on the issue of disability.

"[T]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision." <u>Hargis v. Sullivan</u>, *supra*, at 1492.

> Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question . . . . When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence . . . . Thus, the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole.

<u>Pickney v. Chater</u>, 96 F.3d 294, 296 (8th Cir. 1996).

*See also*, Ramirez v. Barnhart, 372 F.3d 546, 554-55 (3d Cir. 2004) ("a hypothetical question posed to a vocational expert must reflect *all* of a claimant's impairments [emphasis in original; internal punctuation omitted]"); Russell v. Barnhart, 58 Fed. Appx. 25, 30 (4th Cir. 2003) ("the hypothetical question may omit non-severe impairments, but must include those that the ALJ finds to be severe"); Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002) ("Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence"); Hunt v. Massanari, 250 F.3d 622, 626 (8th Cir. 2001) ("When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence").

The hypothetical question posed to the VE in this case was as follows:

> If we were to consider hypothetically then an individual with the age, education, experience as, say, the Claimant, we would find that this individual is limited to a sedentary range of work and the individual needs to have the opportunity to occasionally alternate between the sit and stand. There is no continuous sitting and no continuous standing, more or less; fee to get up and down when they need to. No overhead work. And with those limitations, would the individual be able to do any of the past relevant work that you've indicated?

[Tr. 516-517].

The VE answered that, given that hypothetical, Salazar could return to her past work as a telemarketer. She further opined that a person in the position outlined in the hypothetical could also do other sedentary, unskilled jobs in the national economy, including charge account clerk and surveillance system monitor. [Tr. 517-518].

In his opinion, the ALJ made findings based on the VE's testimony that Salazar could return to her past work as a telemarketer and is capable of making a successful adjustment to other work in the national economy. He found, in addition, that Salazar could return to her past work as a

records clerk, even though the VE did not so testify.  [Tr. 28].  The VE, however, did not consider all of Salazar's limitations.  As noted above, the ALJ found that Salazar's hand impairment and sleep apnea are "severe" limitations; however, he did not include these limitations in the hypothetical question he posed to the VE.  On remand, hypotheticals posed to the VE should include all of the claimant's limitations.  As was true in Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985), "we cannot assume that the vocational expert would have answered in a similar manner had the ALJ instructed him to consider all of the appellant's severe impairments."

As indicated in the medical records, summarized above, Salazar's use of her hands is limited. The ALJ's finding that this is a severe condition is supported by the record.  She stated in her Disability Activities questionnaire that she cannot buckle a seat belt in the car due to pain in her hands.  She stated that she used to have nice handwriting but now cannot even use a computer. When she tried to perform a temporary job stuffing envelopes she had to quit because, in addition to the neck and back pain this work caused, she couldn't use her hands to do the work.  She stated at the administrative hearing that she used to like to refinish furniture but can no longer paint and sand. She cannot pick up anything over five pounds and has to use both hands to lift a gallon of milk.  She also stated that any hand movement increases the already-existing pain in her arms, chest and neck.

Salazar told the doctor at the Hand Clinic that she used to do data entry and a lot of typing but cannot do so now.  X-rays ordered by the hand doctor showed that Salazar has some fused bones in both the right and left hands.  Although nerve conduction studies did not show evidence of carpal tunnel syndrome, the doctor nevertheless noted in the report that Salazar's hand symptoms "are troubling to her and limiting her lifestyle."  [Tr. 392].  A bone scan showed some degenerative changes of the wrists.  Although she found no evidence of arthritis at the first visit, the hand specialist

appears to have changed her mind as she noted at the second visit in December 2001 that the non-fused portions of Salazar's hands "have a little bit of early arthritis in them."  [Tr. 386].

This medical evidence, along with the anecdotal evidence from Salazar about her daily activities, supports the finding that Salazar's hand condition is "severe."

The same is true for Salazar's sleep apnea condition.  As noted above, although the record shows Salazar gets relief from the CPAP therapy, it also indicates that the therapy has not been 100% effective and Salazar continues to get sleepy during the day, usually taking a nap of 1 to 1½ hours each day.  The Court finds that the record supports the ALJ's assessment that Salazar's sleep apnea is a severe impairment.

A remand is necessary in this case because the ALJ found Salazar's hand impairment and sleep apnea condition to be legally "severe" and should have included these conditions in the hypothetical posed to the VE.  If the ALJ determines that another hearing is necessary, he must:

> re-call a vocational expert and to include in any hypothetical posed to him [or her] an explanation of . . . [all of the claimant's] limitations, and thereafter to determine whether, in light of the full record, [the claimant] . . . is nonetheless able to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.  [Internal quotation marks omitted].

Swope v. Barnhart, 436 F.3d 1023, 1026 (8th Cir. 2006).

II.
Claimant's Other Allegations

As this case must be remanded for a new RFC finding and, if necessary, another hearing, the Court will discuss briefly two other arguments raised by Salazar.

A.  The ALJ Did Not Err in Finding That Claimant's Mental Impairment Was Non-severe

The Court finds the Commissioner's argument persuasive on this issue.  While Salazar's

depression and anxiety are documented in several places on the record, and she has been taking medication for these conditions, on and off, for several years, she never sought care from a psychologist or psychiatrist.  And the record is clear that for the most part it is Salazar's pain, rather than a mental impairment, that prevents her from doing those things she used to enjoy.

For example, in the Daily Activities questionnaire,[24] Salazar was asked whether and how often she goes shopping.  Part of the question read, "Is it difficult leaving the house?  Do you have difficulty being around a lot of people?"  She answered that she does not go out by herself and requires a lot of help to go shopping, but the reasons are not psychological:  "I don't have difficulty with other people.  I have difficulty with pain."  [Tr. 156].

Later in this form under the heading of "Emotional Problems," she attributed some of her depression to her physical limitations, answering that she suffers from depression and anxiety and has problems with memory and concentration and noting, "I have c[h]ronic pain, and yes I get depressed, and I get anxiety from being in pain and not being able to do what I used to do when I was healthy." [Tr. 159].  Salazar says that her social contacts are mostly with her family, when they come to visit her.  Her relationships with her family are very close, she says, and she does not have problems getting along with other people.  [Tr. 157].

Salazar's sister confirmed Salazar's statements that her social limitations are primarily due to pain rather than any difficulty interacting with others.  The sister wrote in her Third Party Daily Activities questionnaire that Salazar's friends are limited to her family due mainly to her inability to travel or move freely outside the home.  Most of her non-family friendships have faded in recent years, she said, because Salazar cannot actively visit or interact.  She does not attend family functions

---

[24]The questionnaire is undated but stamped as "Received" on March 4, 2003.

often, but when she does she interacts well socially; however, she is limited in movement and usually sits in one spot during these events.  She said also that when Salazar still in the workforce she got along well with her co-workers.  [Tr. 172-173].

These statements are confirmed in the psychiatric evaluation of Salazar conducted on March 11, 2002 by Dr. Gerald Fredman [Tr. 221-227], and also by the Psychiatric Review Technique ("PRT") assessments, three of which appear on the record (the first was dated March 13, 2002, by Scott Walker, MD [Tr. 236-249]; the second dated June 10, 2002, by LeRoy Gabaldon, Ph.D. [Tr. 274-287], accompanied by Dr. Gabaldon's RFC Capacity Assessment - Mental [Tr. 288-291]; and the third dated March 13, 2003, again by Dr. Walker [Tr. 437-450]).

Dr. Fredman noted that Salazar's depression and anxiety were related to her pain and physical limitations.  He noted that the frequency and intensity of Salazar's panic symptoms is diminished with Zoloft, that she does not have agoraphobia (fear of leaving the safety of home or of being in large open or crowded spaces[25]), and that her depression is characterized primarily by a sense of fatigue with no motivation to do things.  [Tr. 221].

In his Decision [at Tr. 22-23, 26], the ALJ accurately summarized Dr. Fredman's findings including the assessment that Salazar has mild psychiatric limitations in the areas of understanding, remembering basic instructions, and concentration.  In a work setting, she would have moderate limitations in the areas of persisting at a task, interacting with the general public or with co-workers, or adapting to changes in the workplace.  The ALJ specifically rejected Dr. Fredman's GAF ("global assessment of functioning") score of 52 as inconsistent with the medical evidence and with Salazar's daily activities.

---

[25] Dorland's at 41.

The Court finds that he ALJ's conclusion that Salazar's psychological impairments are less than "severe" is supported by record evidence and upholds this finding.

B. The ALJ Did Not Fail to Develop the Record

Salazar argues that the ALJ failed in his duty to develop the record, in three ways: (1) he did not assist Salazar in procuring medical reports for inclusion in the administrative record; (2) he failed to ask questions at the hearing or otherwise elicit information from Salazar about her depression and anxiety; and (3) he did not expressly solicit opinions from her treating physicians as to whether or not Salazar was disabled.

An ALJ has an obligation, particularly when a claimant is not represented by counsel, to ensure that the record is complete and adequately developed. Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993). However, the Court finds that the ALJ fulfilled his duty in this regard with respect to Salazar's claim.

The ALJ did not err in failing to contact Salazar's doctors and ask them to give an opinion whether or not she is disabled. It is up to the ALJ to make the ultimate legal determination of disability, and although it might have been helpful if an opinion from the treating physicians on this ultimate issue appeared in the record, this was not necessary. There was ample medical evidence in this case, including multiple diagnoses and records of Salazar's statements to doctors as to how her medical problems interfere with her daily functioning. The lack of an express opinion from a treating physician on the issue of disability does not prevent the ALJ from making the required disability determination based on the overall record, and he does not have an affirmative duty to seek out such an opinion.

In addition, the Court rejects the argument that the ALJ should have assisted Salazar in

43

procuring medical records.  While the hearing transcript indicates that there was some discussion, prior to the hearing itself, about the existence of additional medical records [*see* Tr. 492-493], it is clear from the transcript that all parties agreed that Salazar would obtain these records and submit them after the hearing.  [Tr. 492-493, 520-521].

The ALJ stated at the beginning of the hearing that he would give Salazar 30 days to submit the additional records.  He also told her that if she needed additional time, he would grant an extension if she requested it, emphasizing that she would have to make the request in writing because that was his only way of knowing that she needed more time.  Salazar said that she understood this.  [Tr. 493].  The ALJ then reminded Salazar at the end of the hearing that he would be waiting for the additional documents and that she should be sure to get those records in.  [Tr. 520-521].  At no time did Salazar protest or indicate that she misunderstood this directive, nor did she ever request the ALJ's help in obtaining these records.

The ALJ filed his Decision on November 5, 2004, more than five months after the hearing. There is no indication that Salazar requested an extension of the 30-day deadline for submitting records.  She did send a letter to the ALJ on July 23, 2004, well after the 30-day period, informing him that she had two medical appointments scheduled on August 23 and 25, 2004.  [Tr. 482-484]. However, no further documentation of the results of these appointments appears in the record. Salazar had more than two months between the time of these appointments and the time the Decision was issued to obtain and submit the records.  She did not do so, and without any indication from her that she needed an extension of time or any sort of assistance in obtaining these records, it was reasonable for the ALJ to assume that Salazar would supply the records if she felt they were important to her claim.  Under these circumstances the ALJ had no reason, and no affirmative duty,

44

to take any further steps to get medical records from Salazar or her medical care providers, and the Court finds no error in the ALJ's actions with regard to these records.

Finally, the ALJ did not commit error in failing to inquire further at the administrative hearing about Salazar's psychological symptoms.  The record indicates that the ALJ gave Salazar ample opportunity to tell him about the conditions on which she based her claim for benefits.  He asked her at one point, "Tell me in your own words, Ms. Salazar, the problems that you're having that would keep you from working?" [Tr. 499].  She began by citing her spine and disk disease, then mentioned that she also has fibromyalgia. [Tr. 499].  After a discussion of these conditions, the ALJ continued, "Now, any other problems other than the disk disease and the fibro?" [Tr. 500].  Salazar told him she has sleep apnea and thalassemia and they discussed these conditions for a bit, after which the ALJ again asked, "Any other problems?" [Tr. 501].  Salazar answered that she has osteoarthritis in her knees and her hands.  He responded, "Okay, Anything else?  Do you see a doctor regularly?" [Id.]. After she answered, he again asked whether she was seeing any other doctors. [Tr. 502].  At the end of the hearing, he asked again, "Anything else?" [Tr. 521].

It is clear that Salazar was given several opportunities to tell the ALJ about any mental or psychological problems that she felt were affecting her ability to work.  She did not have legal representation at the hearing but was not shy about speaking up for herself.  She asked questions of the VE [Tr. 518-520], and toward the end told the ALJ that she would "like to make a statement" and thereafter did so, providing additional information that she thought should be on the record. [Tr. 520].  Although it might have been preferable if the ALJ had explicitly asked Salazar about her conditions of depression and anxiety, his failure to do so would not, in itself, justify a remand.  Other evidence appearing on the record was sufficient for him to determine the severity or non-severity of

her psychological impairments.

Because this case will be remanded for further proceedings, these psychological issues may be explored further, if a hearing becomes necessary.  The Court does not find, at this point, that the ALJ committed error in not doing so at the initial hearing.

## Conclusion

In an otherwise thoughtful, well-considered and well-presented opinion, the ALJ erred in his determination of Salazar's RFC and in failing to include all of Salazar's severe impairments in the hypothetical posed at the administrative hearing.  The case will therefore be remanded for reconsideration.

If, on reconsideration, the ALJ determines that Salazar does not have the RFC for sedentary work, then a finding of disabled may be appropriate without another hearing.  If the ALJ determines that another hearing should be held, he must include all severe impairments in any hypotheticals posed.

## Order

IT IS THEREFORE ORDERED that Salazar's Motion to Reverse and Remand for a Rehearing [Doc. 13] is granted, and this matter is remanded to the Commissioner for proceedings consistent with the above Memorandum Opinion.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge